IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CRIMINAL NO. 3:11-15 |
| v. | ) | |
| | ) | JUDGE KIM R. GIBSON |
| DENNIS L. BRUNO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.  Synopsis

Pending before the Court is Defendant Dennis L. Bruno's motion to withdraw his guilty plea (ECF No. 66).  On May 9, 2011, Defendant waived his right to an Indictment and entered a plea of guilty to Count 1 of the Information, which charged Defendant with misappropriating funds from a federal grant.  Defendant now asserts that he pled guilty "based on legally and factually erroneous information as to the offense at issue and without knowledge that he would lose his state pension as a result of his guilty plea." (ECF No. 66 at 1).  Defendant argues that these are fair and just reasons to permit him to withdraw his guilty plea.   For the reasons explained below, the Court will deny Defendant's motion.

### II.  Standard of Review

"[A] guilty plea is a grave and solemn act to be accepted only with care and discernment."  *Brady v. United States*, 397 U.S. 742, 748 (1970).  The Supreme Court has explained,

> A plea of guilty differs in purpose and effect from a mere admission or an extrajudicial confession; it is itself a conviction. Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence. Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences.

*Machibroda v. United States*, 368 U.S. 487, 493 (1962) (quoting *Kercheval v. United States*, 274 U.S. 220, 223 (1927)).

"Once a court accepts a defendant's guilty plea, the defendant is not entitled to withdraw that plea simply at his whim." *United States v. Jones*, 336 F.3d 245, 252 (3d Cir. 2003). Instead, a defendant seeking to withdraw his guilty plea bears a "substantial" burden to demonstrate a fair and just reason. *Id.* Rule 11 of the Federal Rules of Criminal Procedure provides,

> A defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal.

Fed. R. Crim. P. 11(d)(2)(B). However, "[a] shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty." *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001) (citations omitted). When deciding a motion to withdraw a guilty plea, a court should evaluate three factors: (1) whether the defendant asserts his innocence; (2) the strength of the defendant's reasons for withdrawing the plea; and (3) whether the government would be prejudiced by the withdrawal. *Id.*; *United States v. Huff*, 873 F.2d 709, 711 (3d Cir. 1989).

**III.     Background**

Before evaluating the factors set forth above, the Court will briefly review the history of this case. This matter arises from a single-count Information charging Defendant with federal program theft in violation of 18 U.S.C. § 666(a)(1). (*See* ECF No. 1). According to the Information, while Defendant was the superintendent of the Glendale School District ("District"), he misappropriated approximately $49,600 of proceeds from a federal grant—the Fund for the Improvement of Education, which is a program funded by the United States Department of Education. (*Id*.).

On February 15, 2005, Defendant completed a grant application to fund part of the District's Broadband Rural Area Information Network (B.R.A.I.N.) project. (Grant Application, Gov't Ex. 1). According to Defendant's grant application, the purpose of the B.R.A.I.N. project was to

> [A]ddress the challenges of improving student academic performance and overcoming the "digital divide" by providing the opportunity to extend the school year and school day to students' homes by becoming a community learning and information hub by providing community access to the Internet wireless broadband connectivity.

(*Id*.). To accomplish this goal, the Glendale Area Information Network (GAIN) was created to provide "an Internet backbone between the school district and the community that delivers high speed Internet connections . . . at very affordable rates." (*Id*.). However, certain communities—specifically, the Glendale Yearound community—were so rural that implementing an affordable high-speed Internet infrastructure was difficult and costly. Hence, Defendant applied for a grant from the Fund for the Improvement of

Education to fund the expansion of the high-speed Internet network to the Glendale Yearound community. (*Id*.).

According to the grant application, the proposed project would expand an existing Internet network from a tower located in Flinton, Pennsylvania, by installing repeater facilities in three locations and residential receivers for forty subscribers. (*Id*.). Sting Communications—which at that time provided Internet service to the District and some surrounding communities—would install and operate the network expansion. (*Id*.). The grant application provided a timeline for the disbursement of the funds and completion of the project. (*Id*.). It also identified the following evaluation criteria for the completed project:

> Evaluation will be based on the successful deployment of the equipment to light the towers in Glendale Yearound. When the towers have been activated and community members have been put on line then the project will have reached its conclusion.

(*Id*.). Finally, the grant application identified Defendant's responsibilities to include "making sure the Sting Communications installs all necessary equipment . . . [and] disburs[ing] the funds as the project is completed." (*Id*.).

After the grant was approved, the United States Department of Education made three disbursements of funds to the Glendale School District: (1) the first disbursement of $20,000 was made to the District on October 3, 2005; (2) a second disbursement of $18,784 was made on October 12, 2005; and (3) the final disbursement of $10,816 was made on July 18, 2006. Work on the project was supposed to take place during this same period of time—approximately a ten-month period from October 2005 through July 2006.

On August 24, 2006, Defendant completed a grant performance report. (Gov't Ex. 2). The report noted that $49,600 had been disbursed for the project. (*Id*. at 1). Defendant stated in the report

> The project has been very successful. The community now has internet access as well as the school. A number of areas are now being served with Internet. Blandburg, Coalport, and Yearround to name a couple. The infrastructure that was completed provides access at the year-round for [ ] families.

(*Id*. at 2). The report also listed the various equipment that was installed and identified the cost of each. (*Id*. at 2).

Sometime after Defendant submitted the performance report, the FBI, the Department of Education, and the Pennsylvania Auditor General initiated a series of investigations.[1] Investigators first made contact with Defendant on May 25, 2010.[2] At that time, George Blissman, an agent with the United States Department of Education, Office of Inspector General, presented Defendant with a "target letter," advising Defendant that he was the target of an investigation. (ECF No. 94 at 55, 125). Agent Blissman testified that during this first meeting with Defendant, "Dr. Bruno admitted to me that . . . the service at the Glendale Yearound was never completed." (ECF No. 94 at 71). Defendant

---

[1] Three separate but related investigations were simultaneously conducted. (ECF No. 94 at 73). The first investigation involved the Yearound grant at issue in the instant case and targeted only the Defendant. (*Id*.). The second investigation involved the B.R.A.I.N. contract, which provided a significant amount of funding through the "E-Rate" program. This investigation targeted Defendant, Darol Lain, and Dave Watkin. (*Id*. at 74). The third investigation also involved E-Rate funding under a contract with Intermediate Units 8, 9, and 10, and targeted Darol Lain and Dave Watkin. (*Id*. at 73-74).

[2] Agent Blissman testified that he became involved in the investigation sometime in May or June of 2009, but that the investigation, which had multiple components, had been ongoing before that time. (ECF No. 94 at 10).

then cooperated with the Government for nearly a year regarding the various ongoing investigations. Throughout this time, Defendant never "question[ed] the Department of Ed. grant misapplication charge he was facing." (ECF No. 94 at 92).

Then, on May 9, 2011, Defendant made his initial appearance before this Court, waived his right to an Indictment, and entered a plea of guilty to Count 1 of the Information. (*See* ECF Nos. 6, 7, 8). Defendant was represented at this proceeding by retained counsel, Arthur T. McQuillan, an experienced criminal defense attorney. At the hearing, the Court conducted an exhaustive plea colloquy with Defendant. (ECF No. 38, Plea Hr'g Tr.).

At the time that Defendant entered his guilty plea, he was 59 years old. (*Id*. at 4). Defendant is a highly educated and accomplished individual. Defendant testified that he completed his doctorate in 2003, explaining,

> I went to Penn State University for my undergraduate. Penn State University for my graduate. Penn State University for a portion of my doctorate, and then I switched to [Nova Southeastern University] in Florida to complete my doctorate in instructional and technology education.

(*Id*. at 4). Regarding his employment history, Defendant testified that he most recently worked for two years as the principal of a charter school in Utah, and was employed for ten years by the Glendale School District in Flinton, Pennsylvania, first as the director of curriculum, then the assistant superintendent, and finally as the District's superintendent. (*Id*. at 6-7). Prior to his employment with the Glendale School District, Defendant was a teacher in the Altoona School District for nearly 20 years.

During the waiver of indictment portion of the May 9, 2011, proceeding, the Court

read the charge in the Information to the Defendant:

> From on or about October 3, 2005, to on or about July 18, 2006, in the Western District of Pennsylvania, the defendant, Dennis L. Bruno, being an agent of an organization, to wit; superintendent of Glendale School District, with said organization receiving in the one-year period beginning on or about October 3, 2005, benefits in excess of $10,000 under the Fund for the Improvement of Education program, a program funded by the United States Department of Education, intentionally misapplied property worth at least $5,000 that was under the care, custody, and control of Glendale School District. That is, the sum of approximately $49,600 in violation of Title 18, United States Code, Section 666(a)(1)(A).

(*Id*. at 10).  After the Court read the Information, Defendant acknowledged that he had

reviewed the Information with his attorney and confirmed that he completely understood

the charge and did not have any questions:

> [THE COURT:]  Do you understand that charge?
>
> THE DEFENDANT:  Yes, Your Honor.
>
> THE COURT:  And is that the charge that you had previously reviewed with your attorney?
>
> THE DEFENDANT:  Yes, Your Honor.
>
> THE COURT:  Do you understand that charge and do not have any questions at this time?
>
> THE DEFENDANT:  I have no questions, Your Honor.  I understand the charge completely.

(*Id*. at 9-11).  Attorney McQuillan informed the Court that he had frequently consulted

with Defendant for over a year prior to the plea hearing regarding the charge in the

Information.  (*Id*. at 14).

During the entry of plea portion of the proceeding, the Court again read the Information to the Defendant. (*Id.* at 13-15). Defendant again acknowledged that he understood the charge:

> [THE COURT:] Do you understand that charge?
>
> THE DEFENDANT: Yes, I do, Your Honor.
>
> THE COURT: And is that the charge that you discussed with your attorney?
>
> THE DEFENDANT: Yes, it is, Your Honor.
>
> THE COURT: Do you understand that you have a right to plead not guilty to that charge and persist and continue in that plea?
>
> THE DEFENDANT: I do understand that, Your Honor.

(*Id.* at 15). After the Court advised Defendant that he would waive certain rights if he pled guilty, Defendant explained to the Court that he understood he was waiving his rights and confirmed that he was guilty:

> THE COURT: If you plead guilty and the Court accepts your plea, do you understand that you will waive your right to a trial and the other rights I have just discussed and there will be no trial, and the Court will enter a judgment of guilt and sentence you on the basis of your guilty plea after considering a presentence report and conducting a sentencing hearing?
>
> THE DEFENDANT: I understand that, Your Honor.
>
> THE COURT: If you plead guilty, do you understand that you will also have to waive your right not to incriminate yourself, since I may ask you questions about what you did in order to satisfy myself that you are guilty as charged, and you will have to acknowledge your guilt?
>
> THE DEFENDANT: I acknowledge my guilt. I understand that.

* * *

THE COURT:  Having discussed your rights with you, do you still wish
to plead guilty today?

THE DEFENDANT:  I wish to plead guilty, Your Honor.

THE COURT:  Do you understand the consequences of that plea?

THE DEFENDANT:  I do, Your Honor.

(*Id*. at 18-20).  The Court also questioned Defendant regarding the plea agreement:

THE COURT:  Do you understand the terms of the plea agreement?

THE DEFENDANT:  I do.  I read it twice.

(*Id*. at 20).

During the change of plea colloquy, the Court reviewed with Defendant the
elements under the applicable statute that the Government would have to prove in order
to obtain a conviction.  (*Id*. at 29-30).  After the Court reviewed the elements, the following
exchange took place:

[THE COURT:]  Do you understand those elements?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  Do you have any questions about them?

THE DEFENDANT:  No, I do not.

THE COURT:  Have you discussed those with Mr. McQuillan?

THE DEFENDANT:  I have.

(*Id*. at 30).  Finally, Defendant again acknowledged his guilt, stating that he deeply
regretted the crime he committed:

THE COURT:  Dr. Bruno, did you, as charged in the information found at
Criminal Number 2011-15, commit the crime of federal program theft?

THE DEFENDANT: Yes. I deeply regret that, too.

THE COURT: You did commit it?

THE DEFENDANT: I did.

(*Id.* at 31). At the Court's request, the Government summarized the evidence it would

offer at trial as follows:

[T]he United States would show that from on or about October 3rd of 2005 to on or about July 18th of 2006, Glendale School District received federal funds from the United States Department of Education totaling $49,600 under the Funds for the Improvement of Education program.

There were three disbursements of funds from the Department of Education to Glendale School District on this grant. The first was on or about October 3rd of 2005, $20,000 of the grant was disbursed to Glendale. Thereafter, on approximately October 12th of 2005, $18,784 more dollars was [sic] disbursed to Glendale. And, finally, on or about July 18 of 2006 the final disbursement was sent to Glendale in the amount of $10,816.

At that time, then employed by the Glendale School District as their superintendent was Dr. Bruno. He also was the applicant on the grant, and he submitted and signed the paperwork for the grant in order for Glendale, as the organization, to receive those federal dollars.

Now, that grant money was to be spent on extending the high speed wireless internet network to all the students throughout the Glendale School District.

On the paperwork that was submitted and signed by Dr. Bruno, he stated that the funds were being used in accordance with the grant application, and he actually stated at one point that "the project has been very successful."

**However, those funds** which were clearly in excess of $5,000 that came into the organization's hands at Glendale **were intentionally misapplied by Dr. Bruno, in that he received those funds and diverted or applied those funds in various other ways that weren't in direct accordance**

10

**with the funding**, as required by the Department of Education when they allocated and gave that money to the Glendale School District.

That would be the evidence that we would show on this count, Your Honor.

(*Id*. at 31-33) (emphasis added). Defendant acknowledged that the Government's recitation of the evidence was true and that he did not disagree with it:

THE COURT: Dr. Bruno, you were present when the Assistant United States Attorney described the evidence that she would produce if this matter would proceed to trial. Is there any respect in which you disagree with what she said?

THE DEFENDANT: No, Your Honor.

THE COURT: Is the information true to your own personal knowledge?

THE DEFENDANT: Yes, Your Honor.

(*Id*. at 33). Defendant then entered his plea of guilty and the Court found that

[T]he defendant is fully competent and capable of entering an informed plea, that the defendant is aware of the nature of the charge and the consequences of the plea, and that the plea of guilty is a knowing and voluntary plea, supported by an independent basis in fact containing each of the essential elements of the offense.

(*Id*. at 34-35).

Sentencing was initially set for September 22, 2011, but was postponed several times while Defendant continued to cooperate and assist with the Government's other related ongoing investigations. In preparation for the sentencing, the United States Probation Office filed a draft presentence investigation report on July 26, 2011, and a final presentence investigation report on August 16, 2011. The final presentence investigation

report explained in detail the charge against Defendant and the offense conduct. (ECF No. 15).

On August 22, 2011, Defendant filed his position with respect to the presentence report, stating that he had reviewed the report and "has no additions, deletions or corrections" to the report. (ECF No. 20). On May 22, 2013, Defendant's counsel filed a sentencing memorandum, stating

> Dr. Bruno pled guilty to the federal offense of Federal Program Fund Theft, 18 U.S.C. §666(a)(1)(A), admitting to intentional misapplication of property. He does not contest that he held a position of public employment during his tenure as Superintendent of Glendale School District.

(ECF No. 59 at 2). Defendant's sentencing memorandum further described his criminal actions as "wrongful conduct—[for] which he has taken full responsibility, including cooperation with the United States government." (Id. at 3). The sentencing memorandum also explained that Defendant "is deeply saddened by his conduct, realizes the very serious nature of the crime, and acknowledges the potential penalties." (Id. at 4). The memorandum reaffirmed that Defendant "has acknowledged his culpability in participating in a wrongful scheme for approximately a 10 month period in 2005 and 2006." (Id. at 4).

Then, on the eve of sentencing and nearly two-and-a-half years after pleading guilty[3] to the charge in the Information, Defendant filed the instant motion to withdraw his guilty plea on August 21, 2013. (ECF No. 66). The Government filed its response on

---

[3] While sentencing was initially set for September 22, 2011, the Court continued the sentencing date several times upon motions filed by Defendant. Sentencing was finally rescheduled for September 4, 2013. (See ECF No. 64).

October 28, 2013.  (ECF No. 80).  The Court heard oral argument on the motion on December 13, 2013, and held an evidentiary hearing on March 26, 2014.  A transcript of the evidentiary hearing was prepared (ECF No. 94), and both Defendant and the Government filed post-hearing briefs (ECF Nos. 98, 99).  This matter is now ripe for disposition.

## IV.     Discussion

With this background in mind, the Court will now separately address the three factors set forth by the Third Circuit—Defendant's assertion of innocence, the strength of Defendant's reasons, and prejudice to the Government—to determine whether Defendant has demonstrated a fair and just reason to withdraw his guilty plea.

### A.     Defendant's Assertion of Innocence

"An assertion of innocence by the defendant weighs heavily in favor of granting a plea withdrawal motion if the assertion is credible."  *United States v. Fazio*, No. 2:09-cr-0325-06, 2011 WL 6780926, at *7 (W.D. Pa. Dec. 27, 2011) (citing *Government of Virgin Islands v. Berry*, 631 F.2d 214, 220 (3d Cir. 1980)).  Nevertheless, bald assertions of innocence are insufficient to permit a defendant to withdraw his guilty plea.  *United States v. Brown*, 250 F.3d 811, 818 (3d Cir. 2001).  "Assertions of innocence must be buttressed by facts in the record that support a claimed defense."  *Id.* (citation omitted).  "In addition to reasserting [his] innocence, a defendant must 'give sufficient reasons to explain why contradictory positions were taken before the district court and why permission should be given to withdraw the guilty plea.'"  *Id.*  (quoting *United States v. Jones*, 979 F.2d 317, 318

(3d Cir. 1992)).  Indeed, as this Court has previously noted, "[a]ssertions of innocence are entitled to little weight when a defendant has credibly admitted guilt through sworn testimony at a prior proceeding."  *United States v. Daniels*, No. 3:06-cr-10-1, 2007 WL 709326, at *3 (W.D. Pa. Mar. 2, 2007) (citing *United States v. Trott*, 779 F.2d 912, 915 (3d Cir. 1985)).

At the plea hearing conducted by this Court, Defendant admitted his guilt, accepted responsibility, and formally entered a plea of guilty, all while under oath. Indeed, Defendant repeatedly acknowledged his guilt and remorsefully explained to the Court that he "deeply regretted" his criminal conduct.  (ECF No. 38, Plea Hr'g Tr. at 31:4). Despite his guilty plea, Defendant now asserts that he is innocent.  Specifically, Defendant contends that he "had a legitimate good faith belief that the work was going to be done and had been done" when he paid the money to Sting Communications.  (ECF No. 88 at 6).  However, the Court finds that Defendant's assertion of innocence lacks credibility and is not support by the facts in the record.

To be guilty of federal program theft, the following elements must be established: (1) that the defendant was an agent of an organization; (2) that in a one-year period, the organization received federal benefits in excess of $10,000; (3) that the defendant intentionally misapplied property; (4) that the property intentionally misapplied was in the care, custody, and control of the organization; and (5) that the value of the property intentionally misapplied was at least $5,000.  *See* 18 U.S.C. § 666(a)(1)(A).  Of these, the only element now in dispute is whether Defendant intentionally misapplied property— i.e., the grant funds.  During the Government's investigation and at the plea hearing

14

before this Court, Defendant admitted that he engaged in this conduct. Likewise, the Government has presented evidence that Defendant engaged in this conduct, which Defendant has failed to adequately refute with convincing evidence.

Defendant has identified "five pieces of evidence or five factual matters," which he argues support his assertion of innocence. (ECF No. 88 at 4). First, when Defendant made payment to Sting, he believed the Yearound project would be completed or had been completed, largely based on Sting's reputable "track record" of completing other projects. (*Id*. at 5-6, 11). Second, Defendant contends that during the Government's investigation he provided a written statement characterizing his actions as simply lacking "due diligence." (*Id*. at 6, 11). Thus, Defendant asserts, he admitted only that his conduct was negligent, not that he intentionally misappropriated the funds. (*Id*. at 18). Third, during a recorded phone conversation, Darol Lain stated to Defendant, "Yes, I completed the project." (*Id*. at 7, 11). Fourth, witnesses stated that Sting installed various equipment for the Yearound project. (*Id*. at 8-9, 11). Fifth, the Government declined to prosecute other individuals connected to the investigation—specifically, Lain and Watkin. (*Id*. at 10-11).

However, Defendant's evidence related to these assertions is insufficient to support his claim of innocence. The Court will evaluate Defendant's evidence under three general categories: Defendant's assertion that the project was actually completed; Defendant's assertion that he told investigators his actions simply reflected a lack of due diligence rather than intentional misappropriation; and Defendant's assertion that the Government chose not to prosecute other individuals involved in the Yearound project

investigation.  Additionally, the Court will address Defendant's delay in raising his claim of innocence and assess Defendant's apparent change of mind.

### 1.     Completion of the Yearound Project

The crux of Defendant's claim of innocence is that the Yearound project was actually completed.  Three of Defendant's five "pieces of evidence" purport to show that Defendant believed the Yearound project was finished.  Defendant asserts that (1) Sting confirmed it had completed the project, and he believed Sting based on its successful track record; (2) Darol Lain stated that Sting had finished the project; and (3) individuals from the Yearound community stated that equipment had been installed, indicating the project was finished.  Defendant's assertions, however, fail to support his claim of innocence for two reasons.  First, Defendant's proffered evidence fails to establish that the project was actually completed.  More importantly, regardless of whether Defendant can show that he believed the project was completed, he has failed to address the primary issue related to his innocence—whether he intentionally misappropriated the grant funds.

To begin, Defendant has failed to produce sufficient evidence to show that the Yearound project was actually finished.  During his initial meeting with investigators, Defendant admitted that "when he left Glendale School District in 2007 that the service at the Glendale Yearound was never completed."  (ECF No. 94 at 71:18).  Moreover, in the same recorded phone conversation in which Lain purportedly stated the Yearound project was finished, Lain admitted that he returned money to the Government on the B.R.A.I.N. project because only 25 percent of the work was actually done.  (ECF No. 94 at 71).  Lain's

admission undermines Defendant's assertion that he believed the project was completed based on Sting's "track record."

Likewise, in attempting to show the project was finished, Defendant cannot rely on the fact that Sting may have installed equipment or provided Internet service to certain customers.  At the evidentiary hearing, Defendant introduced three interview reports from the Government's investigation—from Shawn Stevens, Michael Joseph Baker, and Bill Barnhart—that contain statements concerning equipment that Sting purportedly installed in various locations.  (ECF No. 94 at 12-14; *see also* Def. Ex. 1, 2, 3).  For example, Barnhart reported that he believed Sting attached an antenna to a water tower.  However, this statement does not prove that Sting completed the Yearound project.  Importantly, Barnhart also stated that the project "did not work as they had planned" because Internet service was never actually provided, which further discredits Defendant's assertion that he thought the project was finished.  (ECF No. 94 at 19-20; Def. Ex. 2).

More importantly, Barnhart's statement does not show that Defendant properly used the funds in accordance with the grant rather than misappropriating the funds as alleged and demonstrated by the Government.  The issue is not whether some people within the geographic boundaries of the District received equipment or Internet service from Sting.  Indeed, Sting was already providing network infrastructure and Internet service to communities within Glendale School District prior to the grant application. Instead, the question is whether Defendant misappropriated grant money earmarked for expanding the network to the Yearound by applying those funds to other purposes. Regardless of any showing that some people in the District received network equipment

or service from Sting, that Barnhart saw an antenna on top of the water tower, or that Lain said the project was finished, Defendant has failed to produce evidence that the grant funds were properly spent.

To further this point, the Government has presented evidence of Defendant's intentional misappropriation of the funds. First, Agent Blissman testified that the initial grant disbursement to the District—the $20,000 payment made in October 2005—was sent from Defendant to Sting and then from Sting to David Watkin, the owner of KSL Group and an E-rate consultant grant writer. (ECF No. 94 at 89). But, as Agent Blissman testified, the transfer of the $20,000 from Sting to Watkin, at the direction of Defendant, had nothing to do with the Yearound grant. (ECF No. 94 at 90; *see also*, Gov't Ex. 3). The transfer of this grant disbursement was detailed in an email from Defendant to Watkin— which is strong evidence of Defendant's intentional misapplication of grant funds. In the email, Defendant explained,

> [M]et with Darol [ ] to review the steps to receiving the money from me for the ed grant [ ] upon receipt of the money I will mail him a check for 20,000. [ ] He will then forward a check to you. . . .

(Gov't Ex. 3).

The Government's evidence appropriately focused on Defendant's misappropriation of the grant money—the central issue in this case—not on whether Defendant thought the project was completed. Simply stated, Defendant's evidence does not show that the money disbursed to the District for the expansion of the network was actually used for the stated purpose in the grant application.

### 2.    Lack of Due Diligence

With his next piece of evidence, Defendant further attempts to assert his innocence by contending that during the Government's investigation, he provided a written statement characterizing his actions as lacking "due diligence."  (ECF No. 94 at 58). However, at other times during the investigation he admitted that his actions were intentional.  Furthermore, at his plea hearing, Defendant told this Court that he was guilty of intentionally misapplying the grant funds.  Other than citing a single written statement, Defendant has not provided any evidence demonstrating that his actions constituted a simple lack of due diligence rather than an intentional act inconsistent with the grant application.

### 3.    Government's Failure to Prosecute Other Individuals

With his final piece of evidence, Defendant attempts to show his innocence by pointing to the Government's choice to forgo prosecution of Lain and Watkin.  This is irrelevant to the matter at hand.  The instant charge concerns the misappropriation of federal grant funds and targets only Defendant—and not Lain and Watkin.  Although the Government was investigating Lain and Watkin, those investigations involved "different sources of money from different federal agencies."  (ECF No. 88 at 30).

In sum, despite these "factual matters," Defendant has failed to sufficiently buttress his assertion of innocence with facts from the record.  The Court has carefully reviewed the testimony and exhibits presented at the evidentiary hearing and has not found convincing evidence to support Defendant's assertion that the project described in

the grant application was finished. More to the point, Defendant has failed to demonstrate that the disbursed funds were properly applied to the grant project, rather than misappropriated for other purposes.

4. **Defendant's Change of Mind and Delay**

Additionally, Defendant has failed to sufficiently explain why he now asserts his innocence in contradiction to his previous unequivocal acknowledgement of guilt. Defendant contends that he believed he was guilty because the government agents "kept telling me that the job was not done." (ECF No. 94 at 127). Defendant testified, "I was unsure at first but because of the amount of times they told me I believed that it was not done." (*Id*. at 128). This contention is unconvincing.

Apart from Defendant's bald assertions, there is no evidence in the record that the investigators coerced Defendant into believing he was guilty. To the contrary, the fact that Defendant is a highly educated, intelligent individual with numerous professional experiences counters his assertion that he simply accepted the investigators' allegations as true. Likewise, the fact that Defendant had extensive school administration experience and grant-writing experience dispels Defendant's assertion that he did not understand the charge against him of misappropriating grant funds.

Further, when Defendant first learned that he was being investigated—indeed, at his very first meeting with investigators—he admitted his guilt. (ECF No. 94 at 71). Thereafter, and until Defendant filed his motion to withdraw his plea, he never disputed the charge of misappropriating federal grant funds. (*Id*. at 145). Neither Defendant nor

his attorney conducted an independent investigation or offered any evidence to contradict the Government's allegations. (*Id.* at 127). There is simply no evidence that, throughout the three-year period during which Defendant was cooperating with the Government, he believed he was not guilty of the charged offense.

Additionally, Defendant waited 27 months after entering his guilty plea before seeking to withdraw his plea. Defendant has failed to explain this significant delay. As one court has noted,

> Because the timing of a defendant's attempted plea withdrawal is highly probative of motive, close scrutiny of the chronology is important in adjudicating whether retraction is fair and just. While an immediate change of heart may well lend considerable force to a plea withdrawal request, a long interval between the plea and the request often weakens any claim that the plea was entered in confusion or under false pretenses.

*United States v. Doyle*, 981 F.2d 591, 595 (1st Cir. 1992). As in *Doyle*, Defendant's "timing belies his rationale." *Id*. Here, the fact that Defendant cooperated with the Government for an extended period of time, never disputed the Government's allegations, and waited for over two years before seeking to withdraw his plea, all undermine his argument that he believed he was innocent of the charge. In sum, the facts in the record before the Court simply do not support Defendant's proffered argument regarding his belated change of mind from his previous plea of guilt.

The key question to be answered in assessing Defendant's assertion of innocence is whether the federal grant money was spent in accordance with the grant application on the Yearound project, or whether it was instead intentionally misappropriated. Defendant has failed to meet his substantial burden of presenting credible facts from the

record to support his claim of innocence.  *Jones*, 336 F.3d at 253; *Brown*, 250 F.3d at 818.

Thus, the first factor weighs in favor of rejecting Defendant's request to withdraw his guilty plea.

### B.    Strength of Defendant's Reasons

The Court must also consider the strength of Defendant's reasons for withdrawing his guilty plea.  Defendant has advanced two reasons to justify his request to withdraw his plea.  (*See* ECF No. 88 at 14).  First, Defendant asserts that he did not understand the charge against him.  Second, Defendant asserts that neither the Government, the Court, nor his counsel advised him that he would lose his pension if he pled guilty.  The Court will separately address these reasons below.

### 1.    Understanding the Charge

Defendant contends that he should be permitted to withdraw his guilty plea because he did not understand the charge in the Information.  This argument is without merit and is contradicted by the record.  First, Defendant is an intelligent, well-educated man, with multiple graduate degrees from reputable universities.  He has significant professional work experience, including managing an entire school district as its superintendent.  Likewise, during his employment in school administration, Defendant was involved in securing numerous grants.  Thus, he is well familiar with the rules governing the use of grant funds.  It simply defies logic that Defendant, with his extensive educational background, professional experiences, and grant-writing experiences, would not understand the charge contained in the Information.

Second, for an entire year prior to pleading guilty, Defendant cooperated with the Government's investigation into his illegal conduct. During this investigation, Defendant met numerous times with the investigating agents and the Assistant United States Attorney for debriefings. He provided detailed written statements. He helped the Government investigate other individuals on matters related to his charged conduct. Throughout this investigation, Defendant indicated that he understood the charge against him, and he did not dispute the charge or question the Government concerning the facts and evidence gathered. On May 5, 2011, in a meeting with the United States Attorney, Attorney Haines went over each element of the charge with Defendant, and he agreed to the facts underlying each element. (ECF No. 94 at 93:11-20, 142:10-24). Furthermore, throughout the investigation, Defendant was represented by competent legal counsel who discussed the charge and the Government's evidence on numerous occasions with Defendant. Thus, there is simply no evidence from the well-documented record in this case that Defendant did not understand the charge against him.

Third, at the change of plea hearing, this Court carefully questioned Defendant concerning the charge in the Information. The Court read the Information to the Defendant twice. The Court questioned both Defendant and his attorney regarding Defendant's understanding of the charge, and both affirmed that Defendant fully understood the charge.[4] The Court read the statutory elements that the Government would have to prove at trial; again, Defendant stated that he understood those elements.

---

[4] Significantly, the phrase "intentionally misapplied" with reference to the grant funds was stated by the Court or the Government six times during the change of plea hearing. (*See* ECF No. 38 at 10, 15, 30, 32).

The Government summarized the evidence against the Defendant, and Defendant acknowledged that the evidence was true. At the conclusion of the Court's careful and thorough colloquy, Defendant accepted responsibility for his actions and pled guilty.

Importantly, Defendant admitted that he committed the crime of federal program theft, stating "I deeply regret that, too." (ECF No. 38 at 31). The Court was convinced then and is still convinced now that, at the time of his guilty plea, Defendant fully understood the charge against him and that he believed that he committed the crime alleged, acknowledging his criminal conduct by pleading guilty. Accordingly, Defendant has not demonstrated that he did not understand the charge against him such that he should be permitted to withdraw his guilty plea. *See United States v. Dennis*, 527 F. App'x 221, 225 (3d Cir. 2013).

### 2. Pension Forfeiture

Additionally, Defendant asserts that neither the Court nor his attorney advised him that if he pled guilty, he would forfeit his pension, worth nearly $1.5 million. On July 14, 2011, approximately two months after Defendant entered his guilty plea, the Pennsylvania Public School Employment Retirement Board notified Defendant that he would lose his pension as a result of his guilty plea. (ECF No. 94 at 149). While the Court is sympathetic to Defendant's loss, the consequence of pension forfeiture is not a sufficient reason to permit Defendant to withdraw his guilty plea.

"Due process requires that a guilty plea be voluntary, that is, that a defendant be advised of and understand the direct consequences of a plea." *United States v. Salmon*, 944

F.2d 1106, 1130 (3d Cir. 1991) [5] (citing *Brady v. United States*, 397 U.S. 742, 755 (1970)). "There is no due process requirement that a defendant be advised of adverse collateral consequences of pleading guilty, even if they are foreseeable." *Livingston v. Pitkins*, 3:09-cv-1278, 2012 WL 3011786, *7 (M.D. Pa. July 23, 2012); *see also United States v. Crowley*, 529 F.2d 1066, 1072 (3d Cir. 1976); *United States v. Cariola*, 323 F.2d 180, 186 (3d Cir. 1963) (noting that explaining all possible collateral consequences by a trial judge is not essential for a fair and just administration of the criminal laws).

"A direct consequence is one that has a 'definite, immediate, and largely automatic' effect on the range of the defendant's punishment." *Parry v. Rosemeyer*, 64 F.3d 110, 113-14 (3d Cir. 1995).[6] Direct consequences of a plea, which must be explained to a defendant, include the maximum prison term, the fine for the offense charged, and the mandatory minimum. *Jamison v. Klem*, 544 F.3d 266, 277-78 (3d Cir. 2008); *Virgin Islands v. Greenway*, 379 Fed. App'x 247, 250 (3d Cir. 2010). But, "consequences no matter how unpalatable which are not related to the length or nature of the federal sentence cannot be considered direct consequences." *Kincade v. United States*, 559 F.2d 906, 909 (3d Cir. 1997). "A collateral consequence is one that is not related to the length or nature of the sentence imposed on the basis of the plea." *United States v. Romero-Vilca*, 850 F.2d 177, 179 (3d Cir. 1988); *Belle v. Varner*, No. 99-cv-5667, 2001 WL 1021135, at *10 (E.D. Pa. 2001) (noting, for

---

[5] Abrogated on other grounds by *United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013).

[6] Superseded by statute on other grounds as stated in *Dickerson v. Vaughn*, 90 F.3d 87, 90 (3d Cir. 1996) and as recognized in *Rice v. Wynder*, 346 F. App'x 890, 893 (3d Cir. 2009).

example, that the failure of a judge to inform a defendant that, as a result of a guilty plea, he may lose his job or be deprived of his voting rights does not invalidate a plea).

A survey of relevant cases shows that the loss of a pension is a collateral consequence, which need not be explained to a defendant at a guilty plea hearing. Courts have consistently held that the loss of such government benefits is a collateral consequence of a defendant's plea of guilty. *See, e.g., United States v. Nicholson*, 676 F.3d 376, 381-82 (4th Cir. 2012) (concluding that the court was not required under Rule 11 to advise the defendant that his FECA benefits could be terminated as a result of his guilty plea, where an individual or entity other than the court was responsible for terminating the defendant's benefits and the court had no control or responsibility over that decision); *United States v. Morse*, 36 F.3d 1070, 1072 (11th Cir. 1994). Similarly, the Pennsylvania Supreme Court recently concluded that the same pension forfeiture provision at issue in the instant case is "not punitive, and is thus a collateral consequence of [a defendant's] guilty plea." *Com. v. Abraham*, 62 A.3d 343, 353 (Pa. 2012) (citation omitted).

In sum, failure to advise a defendant of a collateral consequence of a plea is an insufficient ground for a plea withdrawal. *See, e.g., United States v. Crowley*, 529 F.2d 1066, 1072 (3d Cir. 1976) ("collateral, but foreseeable, adverse consequences of the entry of a plea do not require the allowance of the privilege of plea withdrawal"); *United States v. Cariola*, 323 F.2d 180, 186 (3d Cir. 1963) ("To hold that no valid sentence of conviction can be entered under a plea of guilty unless the defendant is first apprised of all collateral legal consequences of the conviction would result in a mass exodus from the federal penitentiaries."). Here, the Court was not required to advise the Defendant that his guilty

plea might result in the forfeiture of his state pension because the pension forfeiture was a collateral consequence that was imposed by an entity other than the Court.

Based on the foregoing, the fact that neither this Court nor Defendant's counsel advised Defendant that his guilty plea would result in a forfeiture of his state pension is not a fair and just reason for allowing Defendant to withdraw his plea.

### C.      Prejudice to the Government

The final factor is whether the Government would be prejudiced by the withdrawal of the guilty plea. "However, the Government need not show such prejudice when a defendant has failed to demonstrate that the other factors support a withdrawal of the plea." *United States v. Jones*, 336 F.3d 245, 255 (3d Cir. 2003) (citing *United States v. Harris*, 44 F.3d 1206, 1210 (3d Cir. 1995)). Because Defendant has failed to meaningfully assert his innocence with supporting facts or provide a fair and just reason for withdrawing his guilty plea, the Government is not required to show prejudice. *See United States v. Martinez*, 785 F.2d 111, 116 (3rd Cir. 1986).

### V.      Conclusion

The Supreme Court has explained that a guilty plea is a "'grave and solemn act,' which is 'accepted only with care and discernment.'" *United States v. Hyde*, 520 U.S. 670, 677, (1997) (citations omitted). "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction . . ." *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). Indeed, it is axiomatic in our criminal justice system that "dispositions by guilty plea are accorded a great measure of finality." *Blackledge v. Allison*, 431 U.S. 63, 71

(1977).  Defendant entered a guilty plea while under oath before this Court.  During his guilty plea hearing, he stated that he fully understood the nature of the charge and admitted that he engaged in the charged conduct.  Defendant, a highly educated and intelligent man, with the advice of competent legal counsel, told this Court that he had reviewed the Government's evidence and agreed that he was guilty of federal program theft.  At his change of plea hearing, Defendant repeatedly and clearly acknowledged his guilt, even expressing remorse for his actions.

The Court has carefully studied the record in this case, including the transcript of testimony and exhibits from the evidentiary hearing, and has considered the erudite arguments of counsel.  The Court has also thoroughly reviewed the transcript from Defendant's change of plea hearing.  In light of the record before the Court and under the weighty principles from the applicable case law and rules of procedure, Defendant has failed to sustain his substantial burden of showing a fair and just reason for withdrawing his guilty plea.  Accordingly, for the reasons stated above, Defendant's motion will be denied.

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | )    **CRIMINAL NO. 3:11-15** |
| v. | ) |
| | )    **JUDGE KIM R. GIBSON** |
| DENNIS L. BRUNO, | ) |
| | ) |
| Defendant. | ) |

## ORDER

AND NOW, this **25**th day of June 2014, having considered Defendant's motion to withdraw his guilty plea and the Government's response, and for the reasons set forth in the foregoing memorandum,

**IT IS HEREBY ORDERED** that Defendant's motion to withdraw guilty plea (ECF No. 66) is **DENIED**.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**